Amanda M. Hansen (17227)
Nathaniel F. McKean (17273)
BEAR Law Group
532 N Colorado St, Salt Lake City, UT 84116
(801) 448-6167
bearlawgroup@outlook.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**SOUTHERN DIVISION**

| | |
|---|---|
| MICHELLE RUTHERFORD,<br><br>　　　Plaintiff,<br><br>vs.<br><br>TOWN OF LEEDS; and<br><br>WILLIAM HOSTER, individually as former Mayor of the Town of Leeds,<br><br>　　　Defendants. | **COMPLAINT FOR RETALIATION, DEFAMATION, DUE PROCESS VIOLATIONS, AND RELATED TORTS**<br><br><br>Case No. _____<br><br>Judge _____ |

**I. INTRODUCTION**

Plaintiff Michelle Rutherford brings this action against the Town of Leeds and its then-Mayor, William "Bill" Hoster, for violations of her constitutional rights and related state-law torts arising from her termination as Town Clerk/Recorder and the subsequent initiation of improper criminal proceedings against her.

This Complaint pleads federal claims under 42 U.S.C. § 1983 for First Amendment retaliation and interference with petitioning rights, Fourteenth Amendment due process violations, and Fourth Amendment malicious prosecution. It also pleads state-law claims for

1

Rutherford v. Town of Leeds et al., Complaint

wrongful termination (public policy exception), defamation/false light, abuse of process, and intentional infliction of emotional distress.

In 2025, Mayor Hoster sought a witness statement from Plaintiff to support criminal charges against a former Town Councilmember. When Plaintiff contacted the prosecutor directly and provided an honest account that did not support those charges, Mayor Hoster terminated her employment four days later, framing it as unauthorized use of a Town trailer, a trailer his own public works employee had personally delivered to her.

This termination was done without legally required due process. As a statutorily appointed municipal officer, Plaintiff's termination required Town Council advice, consent, and approval. Town leadership permitted Mayor Hoster to exceed his lawful authority through deliberate inaction and a de facto culture of unchecked executive power.

Mayor Hoster then escalated by contesting Plaintiff's unemployment benefits. When that failed, he filed criminal charges. With the involvement of County Attorney Jerry Jaeger, Plaintiff was charged with two felonies, unauthorized use of public property and witness tampering, neither of which was supported by the facts or evidence. Both charges were dismissed.

The damage, however, remains. Plaintiff has suffered lasting reputational harm, lost employment opportunities, and suffered serious impacts on her health and well-being.

Plaintiff alleges that Defendants' actions violated her rights under the First, Fourth, and Fourteenth Amendments and constitute actionable torts under Utah law. Plaintiff seeks declaratory relief, compensatory damages, punitive damages against Mayor Hoster in his individual capacity, attorneys' fees and costs under 42 U.S.C. § 1988, and all other appropriate relief.

2

Rutherford v. Town of Leeds et al., Complaint

**TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................................ 1

II. PARTIES ...................................................................................................................... 4

III. JURISDICTION, VENUE, AND RELATED PROCEDURAL MATTERS .......................... 4

IV. STATEMENT OF FACTS ............................................................................................. 5

    A. Plaintiff's employment as Town Clerk: ................................................................... 5

    B. Pattern of control and retaliation preceding termination: ........................................ 7

    C. Mayor's conflict with a former Town Councilmember: ............................................ 9

    D. Plaintiff's termination for use of a publicly accessible trailer: ............................... 10

    E. Comparator Evidence and Disparate Treatment ................................................... 13

    F. Town Hall meeting on May 14: ............................................................................ 13

    G. Plaintiff's unemployment benefits and UI Appeals Hearing: ................................ 15

    H. Defendants initiate criminal proceedings: ........................................................... 17

    I. The 9/11 Incident with Mr. Stone: ........................................................................ 18

    J. Criminal process against the Plaintiff: .................................................................. 20

    K. Plaintiff's damages and continuing impact: .......................................................... 24

V. CLAIMS FOR RELIEF ................................................................................................ 26

    VI.      Regarding Federal Law Claims: .............................................................. 26

    B. State Law Claims: ............................................................................................... 27

    COUNT I – Retaliatory Prosecution .......................................................................... 28

    COUNT II – Malicious Prosecution ........................................................................... 30

    COUNT III – Violation of Due Process (Stigma-Plus) ................................................ 32

    COUNT IV – Retaliation for Protected Speech (Termination) ..................................... 35

    COUNT V – First Amendment Retaliation for Petitioning the Government / Interference with Access to Courts ................................................................................................ 36

    COUNT VI – Wrongful Termination .......................................................................... 38

    COUNT VII – Defamation and False Light ................................................................. 40

    COUNT VIII – Abuse of Process: .............................................................................. 42

    COUNT IX – Intentional Infliction of Emotional Distress (IIED) ................................ 43

VI. JURY DEMAND ........................................................................................................ 45

VII. PRAYER FOR RELIEF ............................................................................................. 45

LIST OF EXHIBITS: ....................................................................................................... 47

Rutherford v. Town of Leeds et al., Complaint

## II. PARTIES

1.  Plaintiff Michelle Rutherford is a resident of Washington County, Utah. On March 27, 2024, she was appointed as Town Clerk/Recorder (Town Clerk) for the Town per Utah Code § 10-3-916, appointed with the consent and approval of Town Council. She served in that capacity until her termination on May 12, 2025.

2.  Defendant Town of Leeds, Utah, (the Town) is a municipal corporation and political subdivision of the State of Utah. It is located in Washington County, Utah. The Town acted through its elected officials, employees, agents, and final policymakers.

3.  Defendant William "Bill" Hoster (Mayor Hoster), is a resident of Washington County, Utah. He served as Mayor of the Town of Leeds. He is sued in his individual capacity for damages and for declaratory and injunctive relief.

## III. JURISDICTION, VENUE, AND RELATED PROCEDURAL MATTERS

### VI.   Jurisdiction and Venue

4.  This Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), as this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

5.  This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy under Article III.

Rutherford v. Town of Leeds et al., Complaint

6. Venue is proper in the Southern Division of the District of Utah under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Washington County, Utah.

**B. Notice for state claims under the Utah Governmental Immunity Act**

7. Plaintiff served a Notice of Claim under the Utah Governmental Immunity Act, Utah Code § 63G-7-401 through -403, on or about October 17, 2025. All other conditions precedent to the state-law claims have been satisfied, excused, or waived.

8. For applicable state-law claims, Plaintiff alleges Mayor Hoster's conduct constituted willful misconduct and/or actions outside the lawful scope of authority, and therefore he is not entitled to employee immunity for applicable state-law claims. *See* Utah Code § 63G-7-202(3)I.

## IV. STATEMENT OF FACTS

**A. Plaintiff's employment as Town Clerk:**

9. Prior to her appointment as Town Clerk/Recorder, Plaintiff served as the Town Bookkeeper beginning January 2, 2024. On March 27, 2024, the Town Council appointed Plaintiff as Town Clerk/Recorder by motion, second, and recorded vote during a public meeting. Plaintiff thereafter took an oath of office to faithfully perform the duties of the position. (Ex. A).

10. The Town Clerk/Recorder position is governed by Utah Code Title 10, Chapter 3, Part 9. By statute, the clerk is appointed by the mayor with the advice and consent of the town council, and all appointed officers continue in office until a successor is appointed and qualified. Utah Code § 10-3-916(1)(a), (4). As an individual appointed to a position under Part 9, Plaintiff's employment

Rutherford v. Town of Leeds et al., Complaint

was not subject to the general civil service protections of Utah Code § 10-3-1105(1)(a), nor to the at-will framework applicable to ordinary municipal employees. Utah Code § 10-3-1105(2)(d). The statutory framework required Council involvement in any personnel action affecting Plaintiff, involvement Mayor Hoster did not obtain.

11. The Town's Policies and Procedures Manual is consistent with this framework. The Manual explicitly recognizes the Town Clerk/Recorder as an appointed position and provides that all Town employees may be terminated at any time by the Mayor only with approval from the Town Council. (Policies and Procedures Manual, Part 1, p. 21, § 8(2)I(2)). (Ex. B) The Manual further provides that suspension or termination shall require the approval of the Mayor and Council during an Executive Session. (Policies and Procedures Manual, Part 1, p. 23, § 8(4)(G)). (Ex. B). The Manual's Preface does not exclude clerks from its definition of employee, unlike elected officials, planning commissioners, contractors, and volunteers, the Town Clerk is not carved out. Plaintiff therefore retained the Manual's procedural protections, including the Council approval requirement and the executive session requirement. Neither was satisfied.

12. To the extent Defendants contend Plaintiff held at-will status, Utah Code § 10-3-1105(2)I provides that this requires the employee to have acknowledged in writing that her employment was appointed or at-will. Plaintiff never signed any such acknowledgment. At an unemployment appeals hearing (UI Appeals Hearing) held July 23, 2025, Mayor Hoster acknowledged that he could not identify any written policy Plaintiff had received and would be "speculating" as to how she would have known such a policy existed. (Ex. C2 at 37:31-37:57). No onboarding materials, signed acknowledgments, or policy receipts were produced in evidence. (Ex. C2 at 37:41 – 39:03).

Rutherford v. Town of Leeds et al., Complaint

**B. Pattern of control and retaliation preceding termination:**

13. As early as January 2024, Mayor Hoster demonstrated a pattern of control and hostility toward the Town Clerk role. The prior Town Clerk told Plaintiff that Mayor Hoster did not treat her with respect and did not communicate with her. That clerk resigned in March 2024 after a week-long mental-health break amid workplace stress.

14. As Town Clerk, when Plaintiff spoke with or assisted councilmembers and other employees, Mayor Hoster repeatedly told her to "stay in your lane." Plaintiff asked what her "lane" was because she had not been given a job description. Mayor Hoster provided a job description he claimed was from the Utah League of Cities & Towns. It described a secretarial role, not the statutory duties of a municipal clerk. Plaintiff later learned Mayor Hoster had generated it using ChatGPT.

15. The Town hosted a volunteer committee known as BLOOM, which organized community events. In or about December 2024, Mayor Hoster erupted in anger at Plaintiff over a proposed Small Business Saturday event that BLOOM had organized to support local businesses affected by construction on Main Street. He subsequently dissolved the committee without Council involvement, dismissed its volunteers without notice, published what Plaintiff believed were false justifications in the Town newsletter, and told Plaintiff in private that the committee's problems were "because of you."

16. At Plaintiff's appointment, Mayor Hoster indicated her pay would remain at the prior clerk's rate but committed to obtaining a raise and/or healthcare coverage. Mayor Hoster secured budget authority for a raise in the July 2024 fiscal year budget but did not provide Plaintiff a raise

Rutherford v. Town of Leeds et al., Complaint

at that time. When Plaintiff later followed up on that commitment, Mayor Hoster scolded her for "asking for more money."

17. On January 29, 2025, Plaintiff was hospitalized. During that period of illness, Councilmembers Peot and Furley contacted Plaintiff directly to inquire about her health. In the course of those conversations, Plaintiff mentioned she had no health insurance. The Councilmembers, who were unaware the Town provided no employee benefits of any kind, were concerned and independently raised the matter with Mayor Hoster. On February 5, 2025, Mayor Hoster scolded Plaintiff for communicating with Councilmembers, accused her of trying to change policies behind his back, and threatened to fire her if she continued. He separately scolded her for raising compensation concerns, though she had discussed compensation only with him, never with any Councilmember. Both communications were protected: discussions with Councilmembers about employee benefits addressed matters of public concern, and communication with the legislative body Plaintiff statutorily served was required by her role under Utah Code § 10-5-121.

18. Later that same day, Mayor Hoster sent a memorandum titled "Expectations Regarding Employee Conduct & Town Council Engagement," copying the Leeds Town Council. The memorandum admonished Plaintiff for communicating with Councilmembers, directed that personnel matters remain confidential, and asserted that the Town Council was not responsible for personnel management. The memorandum mischaracterized Councilmember Stirling's routine professional courtesy as evidence of a disciplinary issue and was copied to the full Town Council, placing them on notice of Mayor Hoster's retaliatory posture. (Ex. D).

19. The February 5 Memorandum did not impose formal discipline, did not identify any violation of Town equipment policies, and did not mention any policy regarding use of Town

8

property. It was not mentioned at the May 12, 2025 termination meeting and was not cited in either termination notice. Nevertheless, Defendants later submitted the Memorandum in their unemployment appeal as evidence of prior disciplinary issues, despite it arising from Plaintiff's protected communications. (See Section G. Plaintiff's unemployment benefits and UI Appeals Hearing:, below.)

**C. Mayor's conflict with a former Town Councilmember:**

20. Late 2024, Mayor Hoster had an apparent personal conflict with a former Town Councilmember (the former Councilmember). The conflict escalated to the point that Mayor Hoster used municipal authority against her and pressured Plaintiff to provide supporting statements to prosecutors.

21. On September 25, 2024, during a Town meeting, another citizen accused Mayor Hoster of improperly pressuring them into an unwanted real-estate transaction. During that exchange, the former Councilmember muttered a statement that Mayor Hoster later characterized as a threat. The statement was not captured by the meeting microphone, but Plaintiff heard the statement directly.

22. After the September 2024 meeting, Mayor Hoster asked Plaintiff to prepare a statement for the prosecutor regarding the incident. Plaintiff did so based on her personal observations of the meeting. Mayor Hoster urged prosecutors to file criminal charges. Charges were filed and later dismissed. The former Councilmember subsequently stated that the prosecution caused extreme and unnecessary stress in her life, and she blamed that stress for the early death of her roommate.

23. On March 18, 2025, the former Councilmember came to Town Hall visibly upset and sought out Mayor Hoster regarding the ongoing conflict and the prior criminal charges. Plaintiff

Rutherford v. Town of Leeds et al., Complaint

was inside Town Hall at the time and heard yelling from the parking lot but did not observe the incident directly and had no contact with her during the incident. Three other citizens, including a former mayor, intervened and escorted the former councilmember away.

24. On May 8, 2025, Mayor Hoster texted Plaintiff asking why she had not yet provided a statement to the prosecutor regarding the pending matter. In response, Plaintiff called the prosecutor's office directly. She told the prosecutor that she could not support charges against someone who appeared to be experiencing a mental health crisis, no longer lived in Leeds, and had not caused her any harm. The prosecutor indicated he had been given different information. Plaintiff asked if anything further was needed and was told no. She then responded to Mayor Hoster's text confirming she had spoken with the prosecutor.

25. Four days later, on May 12, 2025, Mayor Hoster terminated Plaintiff. (Ex. E)

**D. Plaintiff's termination for use of a publicly accessible trailer:**

26. The Town owns a 2008, 10-foot dump trailer (the Trailer). Day-to-day control over the Trailer and other Town vehicles and equipment was exercised by a Town public-works employee, Bill Stone (Mr. Stone).

27. The Trailer had been used by residents with permission from the Town and/or Mayor Hoster in the past. Mayor Hoster publicly stated that "anyone could use the Town's trailer with the Town's permission" on at least one occasion. (Exs. L, M). Mr. Stone testified that the Trailer was accessible to residents with authorization: a resident would ask him, and he would seek permission from the Mayor. (Ex. C2 at 1:12:13 – 30).

10

Rutherford v. Town of Leeds et al., Complaint

28. April 26, 2025, Plaintiff requested use of the Trailer for work at her father's property. Mr. Stone personally delivered the Trailer to Plaintiff's father's residence without objection or comment. Mr. Stone later testified that he did not obtain permission from Mayor Hoster before delivering the Trailer. (Ex. C2 at 1: 11:54 – 13:43). His unprompted delivery supports an inference that such use was normal and permissible.

29. On May 12, 2025, Mayor Hoster terminated Plaintiff, purportedly for her use of the Trailer, four days after the May 8 exchange and more than two weeks after the Trailer use.

30. Plaintiff was called into a meeting with Mayor Hoster, Councilmember Ron Cundick, and Town counsel Craig Hall (Mr. Hall) participating remotely by speakerphone. Mayor Hoster handed Plaintiff a termination notice (Termination Notice 1) and informed her she was fired. She was given no opportunity to respond.

31. In the meeting and in Termination Notice 1, Defendants acknowledged they could not cite a specific policy provision supporting termination: "While the Town's current personnel policies may not list this specific infraction," the Trailer use purportedly violated a "basic and reasonable expectation" of a municipal employee. The notice further asserted the Trailer was "municipal property designated solely for sanctioned government use." (Ex. E):

32. Termination Notice 1 included, among other things, the following:

   a. It was addressed to "Ms. Michele Rutherford," misspelling Plaintiff's first name.

   b. It stated termination was effective "11:00 a.m. MDT on May 12, 2025."

   c. It stated Plaintiff was terminated for "the recent unauthorized use of equipment/property," but cited no specific Town policy.

Rutherford v. Town of Leeds et al., Complaint

    d.  It dated the Trailer use as "April 6, 2025" (apparently a typographical error; Termination Notice 2 corrected this to April 26, 2025, as noted in ¶52(d))."

    e.  It estimated the Trailer's value as "more than $15,000."

    f.  It suggested the Trailer use was "possibly in violation of criminal statutes," but cited no specific Utah Code provision or municipal ordinance.

    g.  It contained an "Authorized by" signature line for the Mayor and a "Received" signature line for Plaintiff.

33. The 'Received' line on Termination Notice 1 had already been signed by Mayor Hoster before it was presented to Plaintiff, leaving no place for her to sign. She declined to sign. An audio recording of the termination meeting documents this interaction. (Ex. G2 at 8:22-8:38). Plaintiff retained the original wet-signature version of Termination Notice 1. (Ex. E).

34. After the termination meeting, Mayor Hoster sent a memorandum to the Town Council notifying and justifying Plaintiff's termination. The memorandum stated the termination had been handled "in accordance with her at-will employment status," described the Trailer use as a "non-negotiable infraction," and asserted the conduct was a serious legal violation, while also stating that no criminal charges were being filed "at this time." (Ex. H).

35. The post-termination memorandum, notifying Council after the fact and invoking 'at-will employment status,' supports an inference that the termination was unilateral, without the Council approval required by the Manual. (Ex. B). No executive session was convened before or after the termination, as required by the Manual's Section 8 § 4(G). (Ex. B). It also disregarded the statutory continuity requirements applicable to the clerk's office under Utah Code § 10-3-916(1)(a), (3)–(4).

Rutherford v. Town of Leeds et al., Complaint

### E. Comparator Evidence and Disparate Treatment

36. The Town's treatment of trailer use reflected a recognized municipal practice, not a bright-line prohibition. As alleged in ¶27, Mayor Hoster publicly stated anyone could use the Trailer with permission, and Mr. Stone testified that use operated through a recognized supervisory channel. (Ex. C2). Residential trailer use was not unprecedented or rogue.

37. A community member observed and photographed the Town trailer parked at Mr. Stone's personal residence on October 15, 2025, and reported that the trailer was parked there almost every day. (Ex. L). No disciplinary action, investigation, or criminal referral was initiated in connection with that conduct.

38. Mr. Stone was not terminated. He was not referred for criminal review. The record presently contains no evidence that any Town employee other than Plaintiff has ever been terminated or referred for criminal investigation based on trailer deployment or use.

39. The inconsistent treatment between Plaintiff and Mr. Stone supports an inference of selective enforcement that undermines the Town's stated justification for termination.

40. Plaintiff reserves the right to develop additional comparator evidence through discovery.

### F. Town Hall meeting on May 14:

41. On May 14, 2025, two days after Plaintiff's termination, Plaintiff attended the regularly scheduled Town Council meeting as a private citizen and addressed the Council regarding her termination and the Trailer allegations.

13

Rutherford v. Town of Leeds et al., Complaint

42. While Plaintiff spoke, Mayor Hoster made facial expressions that attendees characterized as dismissive and condescending. Mayor Hoster cut Plaintiff's allotted three-minute comment period short, stopping her at two minutes and forty-eight seconds. By contrast, a preceding speaker who had been combative toward the Mayor was allowed three minutes and fifty-one seconds. (Exs. I1, I2, I3, K)

43. Following Plaintiff's remarks, a member of the Town Council stated on the record: "On behalf of this town, I would like to personally thank Michelle Rutherford for her service, both as a staff member and as a volunteer on the Bloom Committee, which was wrongfully disbanded." (Exs. I1, I2, I3). Mayor Hoster immediately called a point of order in an attempt to cut off the councilmember's remarks.

44. Dan Brown (Mr. Brown), a member of the public, reacted to Mayor Hoster's conduct during Plaintiff's remarks by muttering an expletive. Mayor Hoster responded by announcing he was contacting the Washington County Sheriff's Office and adjourned the meeting. Over the following days, the Sheriff's Office made multiple attempts to reach Mr. Brown by phone and in person. When a deputy reached him, he conveyed that the Town Council wanted a promise of no further disruptions, and that Mayor Hoster reserved the right to pursue charges regardless. (Ex. K)

45. At the May 28, 2025 Town Council meeting, Mr. Brown approached Mayor Hoster after the conclusion of the meeting and offered an apology for his conduct. Unprompted, Mayor Hoster stated that his facial expressions reflected his 'shock' and 'horror' that Plaintiff was 'admitting to a felony on record. Mayor Hoster further stated 'she is my friend' and 'I would never harm her.' At the time Mayor Hoster made these statements, no criminal charges had been filed against Plaintiff. (Ex. K).

**G. Plaintiff's unemployment benefits and UI Appeals Hearing:**

46. On June 5, 2025, Plaintiff applied for unemployment benefits with the Utah Department of Workforce Services (DWS).

47. DWS transmitted requests for information through SIDES, its employer communication portal. Defendants did not have access to the SIDES portal and were unaware of the requests until after the June 16 deadline had passed. On June 25, 2025, DWS also left a voicemail requesting information with a June 27 deadline. The Town did not respond by that deadline. Mayor Hoster later testified that Deputy Clerk Cari Bishop (Bishop) contacted him about the missed deadlines and reached out to DWS for access, though he acknowledged this was only his best understanding. (Ex. C2 at 26:34-27:12).

48. On July 1, 2025, DWS issued a written determination finding Plaintiff had been discharged without just cause and was entitled to benefits. That same morning, at 8:07 a.m., Mayor Hoster submitted a criminal referral to the Washington County Sheriff's Office regarding the Trailer use. (Ex. N). The Town filed its unemployment appeal the following day. In their SIDES response, Defendants characterized the Trailer use as felony misuse under Utah Code § 76-8-402 and submitted the February 5 Memorandum as evidence of prior discipline. (Ex. D).

49. On July 23, 2025, DWS held an administrative hearing regarding Plaintiff's eligibility and the Town's appeal (UI Appeals Hearing). Mayor Hoster, the Town's counsel (Mr. Goodrich), Mr. Stone, and Deputy Clerk Cari Bishop attended by phone. (Exs. C1, C2).

50. At the UI Appeals Hearing, Mayor Hoster could not identify a specific written policy prohibiting Plaintiff's use of the Trailer. No onboarding materials, signed acknowledgments, or

Rutherford v. Town of Leeds et al., Complaint

training records were identified as evidence that Plaintiff received written notice of any policy specifically prohibiting such use. When asked how Plaintiff would have known of such a policy, Mayor Hoster testified that he "didn't believe" he referenced the policy in the termination letter and would be "speculating" as to how she knew of it. (Ex. C2 at 37:31–37:57). He further testified, "It just seems common sense to me that you don't go and use public property for yourself." (Ex. C2 at 38:35–39:03). He testified that the decision ultimately "narrowed down" to whether he could "trust" Plaintiff going forward. (Ex. C2 at 40:13–40:39).

51. In that hearing, Defendants submitted documents that differed from what Plaintiff received at termination. Defendants submitted a second termination notice (Termination Notice 2), representing it as the original despite material differences from Termination Notice 1. (Ex. F). In a later investigation for the County Attorney's Office, the investigator described Termination Notice 2 as "altered" and concluded it was not the notice provided to Plaintiff at termination. (Ex. U).

52. In contrast to Termination Notice 1, Termination Notice 2 stated, among other things:

b.   It did not contain a salutation to Plaintiff or even identify Plaintiff in document.

c.   It stated Plaintiff was terminated "effective immediately," not 11:00 a.m. May 12.

d.   It stated Plaintiff was terminated for reasons the Town's personnel policies "may not list," but that the expectation not to use the Trailer was "basic and reasonable."

e.   It dated the Trailer use as April 26, not April 6.

f.   It estimated the Trailer was valued "in excess of $5,000," not $15,000.

g.   It specifically asserted Plaintiff violated Utah Code § 76-8-402.

Rutherford v. Town of Leeds et al., Complaint

h.  It contained no "Authorized by" signature line and no "Received" signature line.

(Ex. F)

53. At the UI Appeals Hearing, Mayor Hoster testified that Termination Notice 2 "is the termination notice that we gave" to Plaintiff, that she refused to sign it and handed it back, and that the recording of the meeting made her signature unnecessary. (Ex. C2 at 45:15-45:49). Plaintiff immediately challenged the document, stating it was "completely different than what was sent in" and asking why a completely different document had been submitted. When confronted with Termination Notice 1, Mayor Hoster stated he was "not familiar with the letter." (Ex. C2 at 48:25-48:42). He did not explain his signature on Termination Notice 1.

**H. Defendants initiate criminal proceedings:**

54. Mayor Hoster did not pursue criminal charges until July 1, 2025, more than seven weeks after termination, despite having stated in his post-termination memorandum that he did not intend to file charges. (Exs. H, G2 at 0:00-1:00).

55. On July 1, 2025, at 8:07 a.m., Mayor Hoster submitted a formal criminal referral regarding the Trailer use to the Washington County Sheriff's Office. In the referral, he stated that Town counsel advised that Plaintiff's conduct "may constitute a felony under Utah Code § 76-8-402." (Exs. N, O). That same morning, the Utah Department of Workforce Services issued its written determination that Plaintiff had been discharged without just cause and was entitled to unemployment benefits. The Town filed its appeal of that determination the following day.

56. On July 22, 2025, the State filed a Criminal Summons charging Plaintiff under Utah Code § 76-8-402. (Ex. P). The following day, July 23, 2025, the UI Appeals Hearing was held. The ALJ

17

Rutherford v. Town of Leeds et al., Complaint

determined that the Town had forfeited its right to appeal by missing both response deadlines, leaving the original DWS determination of wrongful discharge intact. Plaintiff was unaware of the pending criminal charge at the time of the hearing. Service of the summons was not completed until August 8, 2025.

57. The criminal referral included factual assertions absent from Defendants' termination materials and inconsistent with earlier representations:

    i.   It stated that Mayor Hoster personally observed the Town's dump trailer hitched to Plaintiff's vehicle outside Town Hall on April 28, 2025.

    j.   It stated that Plaintiff sent a text message on May 2, 2025, requesting approval to leave the Trailer at her father's property for an additional day.

    k.   It stated that Plaintiff's termination resulted from an "irreparable loss of trust."

    l.   It estimated the Trailer's value at more than $5,000 and identified a "replacement value" of $11,000. (Ex. N)

**I. The 9/11 Incident with Mr. Stone:**

58. On July 17, 2025, Plaintiff had lunch with Mr. Stone at her home. Mr. Stone expressed frustration with Mayor Hoster's actions and offered to testify on Plaintiff's behalf at the UI Appeals Hearing. Plaintiff declined and stated she would not call him as a witness unless absolutely necessary because she did not want to jeopardize his employment. When Mr. Stone asked what he should say if called, Plaintiff told him to tell the truth.

59. On July 23, 2025, Mr. Stone testified at the UI Appeals Hearing. (See Section D, above). Although he had previously offered to testify on Plaintiff's behalf, he testified for the Town.

18

Rutherford v. Town of Leeds et al., Complaint

Plaintiff was disappointed but made no objection at the hearing and does not challenge the substance of Mr. Stone's testimony.

60. On September 11, 2025, Plaintiff and another citizen organized a 9/11 Memorial and Flag Retirement Event at the municipal park. Mr. Stone had agreed to bring a new Town flag to replace the one being retired but did not appear at the event. Plaintiff sent another attendee to retrieve a flag from Mr. Stone's residence. The event proceeded successfully. Afterward, Plaintiff learned that the flag used in the ceremony was Town property that needed to be returned directly to Mr. Stone.

61. Plaintiff drove to Mr. Stone's residence, which was two houses away. Mr. Stone was standing in his driveway when Plaintiff arrived. Upon seeing her, he ran inside and shut the door, leaving a 14-year-old boy alone in the driveway in the dark. The boy asked if he could help. Plaintiff said no and went to the door. The boy said "They don't want to talk to you." Plaintiff replied that she did not want to talk to them either. She knocked and said "Please just open the door and take the flag from me." When Mr. Stone didn't respond, Plaintiff stated she was not going to put the United States flag on the floor. Mr. Stone did not open the door. As Plaintiff walked away she said "Fine, be a little bitch." She told the teenage boy to stay out of it, got in her car, and took the flag to the other citizen who helped with the ceremony. Plaintiff had no further contact with Mr. Stone until December 4, 2025. The flag was subsequently returned to Mr. Stone through another event organizer.

62. Approximately two weeks later, Plaintiff learned through a community member that a rumor had circulated that she had gone to Mr. Stone's home and "cussed him out." Shortly thereafter, Plaintiff's counsel notified her that a witness tampering charge would be filed based on

19

Rutherford v. Town of Leeds et al., Complaint

the September 11 incident. The sole evidentiary basis for that charge was Mr. Stone's handwritten letter dated September 29, 2025, which had been obtained and presented to the County Attorney's Office by Mayor Hoster. That letter described community tensions and Mr. Stone's loyalty to Mayor Hoster but contained no allegation that Plaintiff threatened or intimidated him, no allegation that he felt threatened, and no facts establishing any element of witness tampering under Utah Code § 76-8-508. (Ex. Q).

**J. Criminal process against the Plaintiff:**

63. As alleged in ¶56, a Criminal Summons was filed on July 22, 2025, served on August 8.

64. Mr. Jaeger was sworn in as Washington County Attorney on August 13, 2025, five days after service of the original summons. Mayor Hoster had participated in the nomination process that resulted in Mr. Jaeger's appointment as a member of the Washington County Republican Party Central Committee. (Exs. BB, CC).

65. On September 30, 2025, the prosecution extended a plea offer requiring Plaintiff to plead guilty to the charged offense and serve three years of probation. It further stated that if Plaintiff did not accept the offer, an additional witness tampering charge would be filed. The only evidence cited was Mr. Stone's September 29 letter, the same letter described in ¶62 that Plaintiff's counsel had already advised did not establish any element of witness tampering. (Ex. Q).

66. The record reflects that Mr. Stone provided multiple statements during the pendency of the criminal proceedings against Plaintiff:

   a. A handwritten statement dated September 19, 2025, which was not produced in criminal discovery;

20

Rutherford v. Town of Leeds et al., Complaint

b.  A handwritten statement dated September 29, 2025, which was produced in criminal discovery as the sole asserted basis for the witness tampering charge filed on October 2, 2025;

c.  A handwritten statement dated October 28, 2025, which was not produced in criminal discovery; and

d.  A recorded telephone interview with investigators, which was not produced in criminal discovery. (Ex. U).

67. On October 1, 2025, Plaintiff's counsel rejected the plea offer in writing, advising that the evidence did not establish probable cause for witness tampering and that there was "nothing in there to indicate Ms. Rutherford tampered with a witness regarding his potential testimony." (Ex. S). On October 2, Plaintiff formally declined at a scheduling conference. That same day, having been armed with the Stone letter Mayor Hoster had obtained and presented, the prosecution filed an Amended Information adding witness tampering, without new evidence, predicated solely on the September 29 letter. (Exs. Q, R). A subsequent independent investigation commissioned by the County Attorney's Office, having reviewed all three of Mr. Stone's handwritten statements, his recorded telephone interview with investigators, and all related evidence, concluded there was no evidence of witness tampering. (Ex. U).

68. On October 17, 2025, Plaintiff served a UGIA Notice of Claim on Defendants, incorporating a cease-and-desist request cautioning against any actions that may unlawfully influence ongoing or potential criminal proceedings. (Ex. X).

Rutherford v. Town of Leeds et al., Complaint

69. On October 24, 2025, Plaintiff's counsel sent the prosecution a memorandum requesting dismissal and outlining evidentiary deficiencies in both charges, with documentary evidence and concerns about escalating an employment dispute into felony prosecution. (Ex. T).

70. On October 31, 2025, Defendant Hoster met with County Attorney Jerry Jaeger regarding the Notice of Claim and related correspondence. (Ex. X). Two days later, on November 2, 2025, Mr. Jaeger emailed Plaintiff's counsel, copying four members of the County Attorney's Office and Chief Terry Taylor, stating that he was opening a criminal investigation into the October 17 Notice of Claim itself, characterizing the cease-and-desist as potential witness tampering or retaliation under Utah Code §§ 76-8-508 and 76-8-508.3. (Ex. Z). Plaintiff's counsel responded thirty-one minutes later, stating that the cease-and-desist plainly directed the Mayor to cease unlawful communications or influence, that it did not restrict Mayor Hoster from communicating with the prosecution as a witness or victim representative, and that the cease-and-desist had proven necessary given Mayor Hoster's continued conduct. On November 17, 2025, Plaintiff's counsel separately transmitted a formal written clarification to Mr. Bosserman, counsel for the Town of Leeds, reiterating that position. (Ex. Y).

71. On November 4, 2025, the County Attorney's Office requested investigative assistance concerning allegations involving Plaintiff and the Town of Leeds. Chief Terry Taylor conducted the investigation (the Taylor Report), reviewing the pending charges and related allegations. The final report was completed on November 24, 2025, and transmitted to Plaintiff's counsel on December 1, 2025. (Exs. U, AA).

72. The Taylor Report concluded that there was "no evidence of any witness tampering." The Report identified potential concerns in certain expanded areas of inquiry, including drinking

22

fountain usage, finance card usage, volunteer hours, and overtime entries. However, each of those matters suffered from the same foundational deficiency as the trailer charge: Plaintiff was never provided with the Policies and Procedures Manual, never informed of the specific policies she was alleged to have violated, and was given no opportunity to respond before adverse action was taken. No formal charges arising from those expanded areas of inquiry were filed. (Ex. U).

73. Communications from the County Attorney to Plaintiff's counsel: On December 1, 2025, following transmission of the Taylor Report, Mr. Jaeger asked Plaintiff's counsel whether the matter could be "resolve[d] … in a fair and just manner." Counsel responded that dismissal was the only appropriate resolution and questioned the propriety of initiating a criminal investigation of counsel in response to a UGIA Notice of Claim. (Ex. AA).

74. On December 3, 2025, Mr. Jaeger stated that he had "submitted [his] concerns" regarding counsel's conduct "to the Utah State Bar" and would allow the Bar to determine whether counsel's conduct was "routine pre-litigation notice" or "unprofessional and potentially criminal in nature." In the same email, Mr. Jaeger stated that his office would be meeting with Mayor Hoster to review the Taylor Report prior to making any final determination. As of filing, Plaintiff's counsel is unaware of any formal disciplinary complaint having been filed. Later that same day, at 4:51 p.m., Mr. Jaeger notified counsel that the case would be dismissed without prejudice based on insufficient evidence to proceed to trial. (Ex. AA).

75. On December 4, 2025, the criminal charges against Plaintiff were dismissed without prejudice. (Ex. V).

76. On December 4, 2025, Plaintiff informed Mr. Stone of the dismissal. M Upon information and belief, Mr. Stone expressed relief and apologized to Plaintiff regarding the witness tampering

Rutherford v. Town of Leeds et al., Complaint

allegations. Upon information and belief, Mayor Hoster had threatened Stone with possible termination or criminal exposure related to his own trailer use and directed him to prepare statements incriminating Plaintiff, and had directed Cari Bishop to help prepare and revise those statements to manufacture support for the tampering charge, then presented them to the County Attorney's Office as its basis.

77. Each escalation followed Plaintiff's exercise of her legal rights: refusing to provide incriminating statements, prevailing on unemployment, and serving a Notice of Claim. The plea offer conditioned resolution on a guilty plea under threat of additional charges based on evidence supplied by Mayor Hoster. Each time, Mayor Hoster's advocacy with the County Attorney's Office preceded and induced the action that followed.

**K. Plaintiff's damages and continuing impact:**

78. The criminal proceedings substantially impaired Plaintiff's ability to address her termination and to pursue new employment. Plaintiff and her counsel were required to defend felony charges while simultaneously evaluating civil remedies related to her termination. The criminal charges and related threats of professional-discipline exposure caused additional expense, delay, and emotional distress. Mr. Jaeger's stated threat to refer counsel to the Bar complicated the attorney-client relationship, forced counsel to defend her own conduct while representing Plaintiff, and caused additional legal expense and delay.

79. Plaintiff was denied employment opportunities as a direct result of the pending felony charges. Since her termination on May 12, 2025, Plaintiff applied for more than one hundred positions. On September 30, 2025, Plaintiff received and signed an employment contract with

24

Rutherford v. Town of Leeds et al., Complaint

ResourcePro. On October 9, 2025, following completion of a background check, Plaintiff received a Pre-Adverse Action Letter and was contacted by telephone by ResourcePro's Senior Talent Acquisition Specialist. ResourcePro advised that the pending charges required postponement of her start date pending resolution, and requested written documentation of the outcome of her October 31, 2025 court date. ResourcePro indicated the contract offer would remain in place if the background check could be cleared. No dismissal was available at the October 31 court date. On December 7, 2025, following dismissal of the charges, Plaintiff contacted ResourcePro to advise that the charges had been dismissed and asked whether the position remained available. ResourcePro did not respond. (Ex. DD). Plaintiff has not secured comparable employment since and has experienced significant reputational harm within her community. Leeds is a small rural community of approximately 271 households, and the felony allegations against a former Town Clerk were widely known within that community.

80. The cumulative stress of her wrongful termination, felony prosecution, and failed employment prospects had severe and documented effects on Plaintiff's physical health. Plaintiff experienced recurrent tension headaches, migraines, vision disturbances, and disrupted sleep throughout the eight months following her termination. On November 25, 2025, Plaintiff woke to excruciating pain and called 911. She was transported by Hurricane Valley Fire & Rescue to the emergency room at Intermountain Health Center in Hurricane, where she received multiple pain medications before being discharged. Plaintiff subsequently received medical bills from both Hurricane Valley Fire & Rescue and Intermountain Health, that she cannot pay due to her continued unemployment.

Rutherford v. Town of Leeds et al., Complaint

81. On October 22, 2025, HintonBurdick, PLLC completed an independent accountant's report covering the period of Plaintiff's employment as Town Clerk, July 1, 2024 through June 30, 2025. The report was published by the Town as an attachment to a public meeting agenda on March 6, 2026 for the March 11 meeting. Among its findings, the report stated that individuals charged with governance indicated that 'a former employee of the Town may not have been compliant with various Town policies.' The Utah State Auditor's Financial Certification for the same period identifies Mayor Hoster as Chief Financial Officer and Cari Bishop as Chief Administrative Officer, establishing their identities as the individuals charged with governance who made that representation to the auditors. (Exs. W, EE). The Town of Leeds employed three people during the relevant period. The report's reference to a former employee is unambiguous as to its subject. Plaintiff received no notice of the audit findings and no opportunity to respond before the report was finalized or published.

## V. CLAIMS FOR RELIEF

82. Plaintiff incorporates all preceding paragraphs by reference. Unless otherwise stated, all Counts are asserted against Mayor Hoster in his individual capacity and the Town of Leeds under *Monell*.

## VI.    Regarding Federal Law Claims:

83. For the federal claim below (Counts I through V), Plaintiff alleges the Town is liable under 42 U.S.C. § 1983 because the constitutional violations were caused by the Town's policy, custom, or practice, or by actions taken, directed, approved, or ratified by the Town's final policymakers.

Rutherford v. Town of Leeds et al., Complaint

84. The Town Council was aware of and acquiesced in Mayor Hoster's pattern of unilateral conduct. The Council permitted Mayor Hoster:

    a. To terminate Plaintiff without the required Council approval and to operate without a lawfully appointed Town Clerk from May 12 through August 26, 2025, in violation of Utah Code § 10-3-916's continuity requirement;

    b. To submit a criminal referral and advance the felony framing of Plaintiff's conduct in official unemployment proceedings;

    c. To fail to correct materially inconsistent documentation submitted in official proceedings; and

    d. To continue characterizing Plaintiff's conduct as felony misuse despite the absence of any identified written policy and shifting factual assertions.

85. Town leadership did this fully knowing of the actions irregularity and impropriety. When the Council finally voted to appoint a replacement, two Councilmembers objected or abstained based on procedural irregularities, while the three remaining Councilmembers voted to approve, reflecting awareness of the irregularities yet proceeding regardless.

86. For each federal claim, Defendants acted under color of state law. Plaintiff seeks compensatory damages, punitive damages against Mayor Hoster in his individual capacity, attorneys' fees and costs under 42 U.S.C. § 1988, and all other appropriate relief. The Town is jointly liable under Monell for the reasons set forth above.

**B**. **State Law Claims:**

Rutherford v. Town of Leeds et al., Complaint

87. For the state-law claim below (Count VI to IX), Plaintiff alleges that Defendants' conduct constituted willful misconduct and/or actions outside the lawful scope of authority, precluding immunity for Mayor Hoster as an individual under Utah Code § 63G-7-202(3)I. To the extent the Utah Governmental Immunity Act otherwise applies, all conditions precedent have been satisfied, including timely service of a Notice of Claim under Utah Code § 63G-7-401 through -403 on or about October 17, 2025.

**COUNT I – Retaliatory Prosecution**

**(First Amendment, 42 U.S.C. § 1983)**

88. The First Amendment prohibits a government official from using or inducing criminal enforcement action in retaliation for protected speech or petitioning activity.

89. Plaintiff engaged in protected activity, including: (a) contacting the prosecutor directly and providing an honest account that did not support the charges Mayor Hoster sought to pursue against a former Town Councilmember; (b) applying for unemployment benefits through DWS; (c) serving a Notice of Claim under the UGIA, Utah Code § 63G-7-401 through -403.

90. After each protected activity, Mayor Hoster responded with conduct that would discourage a person of ordinary firmness from exercising such rights:

    a. After Plaintiff provided an honest account to the prosecutor that did not support Mayor Hoster's charges, he terminated her, citing the Trailer use that had been known to him for over two weeks without action;

    b. After DWS determined Plaintiff was discharged without just cause, he submitted a criminal referral to the Washington County Sheriff's Office the same morning;

28

Rutherford v. Town of Leeds et al., Complaint

c. Mayor Hoster supplied the coerced Stone statement that was used to condition the plea offer on an explicit threat of additional charges; after Plaintiff rejected the offer, the prosecution filed the second felony charge that same day; and

d. After Plaintiff served a UGIA Notice of Claim, Mayor Hoster presented that notice and the third Stone statement to Mr. Jaeger, who then stated he was opening a criminal investigation into the Notice itself.

91. The timing and sequence of events support an inference that retaliation was a substantial or motivating factor in Defendant Hoster's referral and advocacy for prosecution:

a. Mayor Hoster terminated Plaintiff for the Trailer use on May 12, 2025, over two weeks after the incident but only four days after her honest account to the prosecutor on May 8.

b. Mayor Hoster submitted the criminal referral on July 1, 2025, over seven weeks after termination, but at 8:07 a.m. the same morning DWS determined Plaintiff was discharged without just cause. No new evidence or changed circumstances prompted the referral. The 54-day gap is explained by the unemployment proceedings, not any investigation.

c. The witness tampering charge, based entirely on the statement Mayor Hoster supplied, was filed October 2, 2025, the same day Plaintiff rejected the plea offer. The charge was predicated solely on Mr. Stone's letter, which did not allege he felt threatened and did not establish any element of the offense. An independent investigation later concluded there was no evidence of witness tampering. (Exs. Q, R, U; see Count II, ¶¶95-96).

29

Rutherford v. Town of Leeds et al., Complaint

d. On October 17, 2025, Plaintiff served her UGIA Notice of Claim. Upon information and belief, at Defendant Hoster's direction, Mr. Stone generated a third statement on October 28, 2025, which was never produced in discovery. On October 31, Mayor Hoster presented the Notice and that statement to Mr. Jaeger. On November 2, Mr. Jaeger stated he was opening a criminal investigation into the Notice itself. The Taylor investigation, which reviewed all three Stone statements and related evidence, concluded there was no evidence of witness tampering. (Exs. X, Z, U).

92. Mayor Hoster did not merely report a crime, he drove the referral and advocacy that produced the prosecution. The charges relied on the narrative, documentation, and coerced witness statements he supplied, presented with the institutional authority of the Mayor's office. But for his referral, framing, and access, the prosecution would not have proceeded as it did.

**COUNT II – Malicious Prosecution**

**(Fourth and Fourteenth Amendments, 42 U.S.C. § 1983):**

93. The Fourth Amendment protects against unreasonable seizures, including seizures effected through legal process. A claim for malicious prosecution under 42 U.S.C. § 1983 requires that the defendant caused the initiation of criminal proceedings against the plaintiff without probable cause, with malice, and that the proceedings terminated in the plaintiff's favor, resulting in damages.

94. Defendants caused criminal proceedings against Plaintiff by referring allegations to law enforcement, meeting with the County Attorney's Office, and advocating for felony charges. As detailed in ¶¶ 54-57 above, Defendants supplied materially inconsistent documentation and

30

evolving factual assertions across proceedings. Their representations were a substantial factor in the initiation and escalation of charges.

95. Mayor Hoster's influence over the County Attorney's Office exceeded that of an ordinary complainant. As a member of the Washington County Republican Party Central Committee, he participated in the nomination of Mr. Jaeger as County Attorney. That political relationship, combined with his October 31 meeting with the County Attorney's Office, the two-day timeline to the investigation of Plaintiff's counsel, and the four-day timeline to the Taylor investigation, supports an inference that the prosecution did not operate independently of his influence. (Exs. BB, CC).

96. The charges lacked probable cause. They relied on inconsistent factual narratives, conflicting termination documents, and a witness statement that did not establish the elements of witness tampering. An independent investigation later confirmed there was no evidence of tampering. No new evidence cured these deficiencies before or after the second charge was filed.

97. Defendants acted with malice. The criminal referral coincided with the unfavorable unemployment determination (¶55); the witness tampering charge followed immediately after Plaintiff declined the plea offer (¶65-67), with no new evidence. This pattern supports an inference the prosecution served purposes other than law enforcement.

98. Both charges were dismissed for insufficient evidence, without adjudication of guilt. (Ex. V). The tampering dismissal followed the County Attorney's own investigation finding no evidence of tampering. (Ex. U). The trailer charge was never supported by an identified written policy. A dismissal for insufficient evidence constitutes a favorable termination for the purposes of this claim, regardless of its without-prejudice designation.

Rutherford v. Town of Leeds et al., Complaint

99. The prosecution subjected Plaintiff to a criminal summons, compulsory court appearances, and ongoing felony charges that restricted her liberty and impaired her employment prospects. The allegations affected her bondability and eligibility for municipal work. Plaintiff suffered reputational harm, legal expenses, emotional distress, and stress-related medical episodes including emergency transport.

**COUNT III – Violation of Due Process (Stigma-Plus)**

**(Fourteenth Amendment, 42 U.S.C. § 1983):**

100.    The Due Process Clause prohibits the government from depriving a public employee of a protected property or liberty interest without due process of law. Where the government publishes stigmatizing accusations in connection with a termination, the affected employee has both a property interest in continued employment requiring pre-deprivation process, see *Cleveland Bd. Of Educ. V. Loudermill*, 470 U.S. 532, 538 (1985), and a liberty interest in reputation requiring a meaningful opportunity to clear her name. See *Siegert v. Gilley*, 500 U.S. 226, 233 (1991); *Workman v. Jordan*, 32 F.3d 475, 481-82 (10th Cir. 2000).

101.    Defendants deprived Plaintiff of both her property interest in continued employment and her liberty interest in reputation without adequate process. As a statutorily appointed officer whose removal required Council approval, Plaintiff held a protected property interest. The Town's own Policies and Procedures Manual required that any termination be approved by the Mayor and Council during an Executive Session. (Policies and Procedures Manual, Part 1, p. 23, § 8(4)(G)). (Ex. B). No executive session was convened. Mayor Hoster admitted as much under oath at the UI Appeals Hearing. (Ex. C2 at 1:28:41). The public

accusations of felony misconduct accompanying her termination implicated a protected liberty interest in her reputation and professional standing.

102.    Defendants publicly accused Plaintiff of felony misconduct, dishonesty, and misuse of public property at the time of her termination. These accusations were communicated to the Town Council, law enforcement, administrative tribunals, and members of the public. (Exs. H, N, O).

103.    The accusations were false or materially misleading. They were made in connection with Plaintiff's termination and were of a type that seriously damaged her reputation and integrity.

104.    As a direct result of these public accusations, Plaintiff suffered reputational harm and lost employment opportunities, including the withdrawal of a job offer following disclosure of pending felony charges. The accusations impaired her ability to obtain bonding or crime-insurance coverage necessary for municipal employment.

105.    Plaintiff received no name-clearing hearing and no pre-deprivation process of any kind. The Town's own Policies and Procedures Manual required that before any termination, the employee receive timely notice of the pre-disciplinary meeting and an overview of the allegations and potential disciplinary action, have the opportunity to review the disciplinary action with the Mayor and respond to the allegations, receive written notification of the findings of any investigation or pre-disciplinary hearing, and have the termination approved by the Mayor and Council during an Executive Session. (Policies and Procedures Manual, Part 1, pp. 21-23, §§ 8(4)I, 8(4)(D), 8(4)(F), 8(4)(G)). (Ex. B).

106.    None of these requirements were met. Mayor Hoster admitted under oath at the UI Appeals Hearing that no executive session was held before Plaintiff's termination. (Ex. C2 at

Rutherford v. Town of Leeds et al., Complaint

1:28:41). Plaintiff was called into a meeting, handed a termination notice, and given no opportunity to respond. She attempted to address the accusations at the May 14, 2025 Town Council meeting, but Mayor Hoster cut her time short and then characterized her remarks as 'admitting to a felony on record,' compounding the stigma. The UI Appeals Hearing offered no name-clearing mechanism and was used to submit altered termination documentation. The pending felony charges and their Fifth Amendment implications prevented Plaintiff from contesting the accusations in any forum. Defendants foreclosed every avenue for Plaintiff to clear her name.

107.    On March 6, 2026, the Town published the HintonBurdick accountant's report to the Utah Public Notice Website as an attachment to the agenda for the March 11, 2026 Town Council meeting. The report is also published on the Office of the Utah State Auditor's website. The report covers the period July 1, 2024 through June 30, 2025, a period that includes both Plaintiff's tenure as Town Clerk and the tenures of other Town employees. Among its findings, the report states that individuals charged with governance indicated that 'a former employee of the Town may not have been compliant with various Town policies.' Plaintiff was the only former employee during the relevant period. The Utah State Auditor's Financial Certification for the same period identifies Mayor Hoster as Chief Financial Officer and Cari Bishop as Chief Administrative Officer, establishing their identities as the individuals charged with governance who made that representation to the auditors. Plaintiff received no notice of this finding and no opportunity to respond before the report was finalized or published. The attribution of noncompliance to a former employee in an official audit record, without notice or any name-clearing mechanism, compounds the deprivation of Plaintiff's liberty interest in her reputation and demonstrates that the harm is ongoing. (Exs. W, EE).

Rutherford v. Town of Leeds et al., Complaint

108.     Plaintiff hereby requests a name-clearing hearing before a neutral decisionmaker with authority to restore her reputation and correct the public record.

109.     The Town's failure to provide required procedural protections before termination, combined with the publication of stigmatizing accusations without a name-clearing hearing, deprived Plaintiff of property and liberty interests protected by the Fourteenth Amendment.

**COUNT IV – Retaliation for Protected Speech (Termination)**

**(First Amendment, 42 U.S.C. § 1983):**

110.     The First Amendment prohibits the government from retaliating against a citizen or public employee for protected speech. Retaliation violates 42 U.S.C. § 1983 when a plaintiff engaged in protected activity, suffered an adverse action that would chill a person of ordinary firmness, and the protected activity was a substantial or motivating factor in the adverse action. See *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000); *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Lane v. Franks*, 573 U.S. 228 (2014).

111.     Plaintiff was terminated on May 12, 2025, four days after she contacted the prosecutor and provided an honest account that did not support Mayor Hoster's charges against the former Councilmember. The Trailer use cited as grounds had occurred on April 26 and been known to Mayor Hoster for over two weeks without action. No new facts arose between May 8 and May 12. The temporal proximity supports causation. The termination also failed to follow the Town's own mandatory procedures, which required Council approval and an executive session before any termination could be imposed. (Ex. B). A termination that bypassed the Town's own procedural requirements supports an inference that the stated justification was pretextual.

Rutherford v. Town of Leeds et al., Complaint

112.     Plaintiff's May 8 communication was made as a private citizen, not pursuant to any duty of the Town Clerk's office. By providing an honest account to a prosecutor on a matter of public concern, she engaged in protected First Amendment speech. No official duty required her to provide statements to prosecutors; let alone accounts she could not truthfully support.

113.     Defendants' explanations for the termination were materially inconsistent. In official proceedings and documentation, Defendants:

   a. Alternately valued the Trailer at amounts ranging from $5,000 to $15,000;

   b. Provided conflicting dates for the alleged use (April 6 versus April 26);

   c. Asserted both a vague "loss of trust" and a supposed policy violation without identifying any written policy;

   d. Submitted a materially different termination notice in the unemployment hearing than the one provided to Plaintiff on May 12.

114.     A community member observed and photographed the Town trailer at Mr. Stone's residence on October 15, 2025, reporting that it was parked there almost every day. (Ex. L). He was not disciplined or referred for criminal review. This selective enforcement, punishing Plaintiff while the employee who delivered the trailer to her used it freely, undermines the stated basis and supports retaliatory motive.

**COUNT V – First Amendment Retaliation for Petitioning the Government / Interference with Access to Courts**

*(42 U.S.C. § 1983)*

Rutherford v. Town of Leeds et al., Complaint

115.     The First Amendment protects the right to petition the government for redress of grievances and to pursue legal remedies through counsel without retaliation or intimidation by government officials. Government action that would deter a person of ordinary firmness from exercising those rights violates the Constitution. See *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). The right to petition includes the right to meaningful access to courts through counsel, and government action that targets a party's counsel to chill or impede litigation constitutes an unconstitutional burden on the party's own First Amendment rights. See *NAACP v. Button*, 371 U.S. 415, 428-29 (1963); *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

116.     The May 14 Town Council meeting illustrates this chilling effect. When a community member reacted to Mayor Hoster's conduct during Plaintiff's remarks, Mayor Hoster called law enforcement, adjourned the meeting, and caused the Sheriff's Office to visit the community member's home multiple times, conveying that charges remained possible. This public demonstration of consequences for supporting Plaintiff would deter a person of ordinary firmness from exercising First Amendment rights, and it foreshadowed the subsequent targeting of Plaintiff's counsel.

117.     Plaintiff engaged in constitutionally protected petitioning activity, including: (a) applying for unemployment benefits; (b) serving a UGIA Notice of Claim; and (c) communicating through counsel and pursuing civil remedies. After each, Mayor Hoster responded in a way that would deter a person of ordinary firmness from exercising such rights:

    a.   After DWS determined Plaintiff was discharged without just cause, Mayor Hoster submitted a criminal referral for the Trailer use that same morning;

Rutherford v. Town of Leeds et al., Complaint

     b.   Mayor Hoster supplied the coerced Stone statement that armed the plea offer's threat of additional charges; after Plaintiff rejected the offer, the prosecution filed a second felony charge that same day; and

     c.   After Plaintiff served a UGIA Notice of Claim, Mayor Hoster presented that notice to Mr. Jaeger, who then stated he was opening a criminal investigation into the Notice itself and later stated he had referred counsel's conduct to the Utah State Bar.

118.     Plaintiff incorporates the allegations and arguments provided above in Count I, which argue the temporal proximity infers causation.

119.     These actions would deter a person of ordinary firmness from pursuing legal remedies or communicating candidly with counsel. Targeting Plaintiff's counsel through criminal investigation threats and a Bar referral struck at the attorney-client relationship itself. Under Button, such interference burdens Plaintiff's First Amendment petitioning rights regardless of whether the threats were carried out.

120.     As a direct and proximate result, Plaintiff incurred additional legal expenses, delay, and emotional distress while defending against parallel threats of criminal investigation and professional discipline directed at her counsel.

**COUNT VI – Wrongful Termination**

**(Utah Statute and Common Law):**

121.     Plaintiff asserts this claim under the statutory framework governing appointed municipal officers. In the alternative, and to the extent any court determines Plaintiff held at-will

Rutherford v. Town of Leeds et al., Complaint

rather than appointed status, her termination violated public policy under Utah common law for the reasons stated herein.

122.    Mayor Hoster's termination of Plaintiff was ultra vires and void. As a statutorily appointed officer under Utah Code § 10-3-916, Plaintiff's removal required the advice, consent, and approval of the Town Council. The Town's own Policies and Procedures Manual independently required Council approval and an Executive Session before any termination could be imposed. (Policies and Procedures Manual, Part 1, pp. 21-23, §§ 8(2)I(2), 8(4)(G)). (Ex. B). Mayor Hoster obtained neither. Under oath at the UI Appeals Hearing, Mayor Hoster admitted that no executive session was held before Plaintiff's termination. (Ex. C2 at 1:28:41). He terminated Plaintiff unilaterally, notified the Council after the fact by memorandum, and characterized the termination as consistent with her at-will status, a characterization that was factually and legally incorrect. Plaintiff never signed a written at-will acknowledgment as required by Utah Code § 10-3-1105(2)I, and Mayor Hoster acknowledged at the UI Appeals Hearing that he could not identify any written policy Plaintiff had received or signed. (Ex. C2 at 38:05-38:30). A termination that exceeded the Mayor's lawful authority, bypassed mandatory Council involvement, and ignored the Town's own procedural requirements was void ab initio and constitutes wrongful termination under Utah law regardless of the underlying motivation.

123.    In the alternative, and to the extent any court determines Plaintiff held at-will rather than appointed status, Utah recognizes a claim for wrongful termination in violation of public policy when an employer terminates an employee for refusing to engage in conduct the employee reasonably believes is unlawful or contrary to a clear and substantial public policy embodied in

constitutional provisions, statutes, or administrative rules. See, e.g., *Touchard v. La-Z-Boy Inc.*, 2006 UT 71; *Peterson v. Browning*, 832 P.2d 1280 (Utah 1992).

124.    Utah public policy favors truthful participation in legal proceedings and prohibits misuse of governmental authority to pursue baseless criminal charges.

125.    Plaintiff's termination violated Utah public policy because it was substantially motivated by Plaintiff's decision to contact the prosecutor directly and provide an honest account that did not support Mayor Hoster's effort to pursue criminal charges against a former Councilmember. Plaintiff willingly participated in prior proceedings, providing a truthful statement at Mayor Hoster's request (¶22). On May 8, she again called the prosecutor directly and gave an honest account. She could not, however, attest to facts she had not observed. Defendants terminated Plaintiff four days after her May 8 communication with the prosecutor, then framed the termination as criminal or quasi-criminal wrongdoing, despite the absence of any written policy provided to Plaintiff prohibiting the conduct asserted as the termination basis.

126.    As a direct and proximate result of Defendants' wrongful termination of Plaintiff, whether under the statutory framework or the public policy exception, Plaintiff suffered damages as set forth herein, including lost wages, reputational harm, emotional distress, and economic losses.

**COUNT VII – Defamation and False Light**

**(Utah Common Law):**

127.    Utah law recognizes claims for defamation and false light where a defendant publishes false statements of fact concerning another that harm reputation or place the person

before the public in a highly offensive and misleading manner. See *Jacob v. Bezzant*, 2009 UT 37;

*Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896 (Utah 1992).

128. Mayor Hoster published false statements accusing Plaintiff of misuse of Town property, dishonesty, and felony misconduct. Defendants knew or should have known that no equipment policy had been provided to Plaintiff, that the Mayor's own public statements permitted trailer use with permission, that the employee who delivered the trailer to Plaintiff was never disciplined, and that others used the trailer without consequence.

129. The statements were communicated to the Town Council, Town employees, law enforcement, and the public. At a public meeting, Mayor Hoster stated Plaintiff was 'admitting to a felony on record' before any charge had been filed, an assertion of criminal fact, not opinion. (Ex. K).

130. In the same conversation, and without prompting, Mayor Hoster privately stated "she is my friend" and "I would never harm her," characterizations inconsistent with a genuine belief that Plaintiff had committed felony misconduct, supporting an inference of knowing falsity. (Ex. K).

131. The statements imputed criminal conduct incompatible with Plaintiff's profession and are defamatory per se under Utah law. Plaintiff suffered lost wages, reputational harm, emotional distress, and economic losses as a direct result.

132. Additionally, the Town's publication of an accountant's report on March 6, 2026, attributing policy noncompliance to the only former employee during the audit period, without notice to Plaintiff or any opportunity to respond, constitutes an additional publication of stigmatizing material. The Utah State Auditor's Financial Certification for the same period

Rutherford v. Town of Leeds et al., Complaint

identifies Mayor Hoster as Chief Financial Officer and Cari Bishop as Chief Administrative Officer, establishing their identities as the individuals charged with governance who made that representation to the auditors. (Exs. W, EE).

133.     To the extent any statements were made in contexts where a qualified privilege may apply, Defendants abused that privilege by acting with knowledge of falsity or reckless disregard for the truth. Any absolute privilege for statements in official proceedings does not reach all statements at issue. Mayor Hoster's 'admitting to a felony' remark was made to a private citizen, not in a judicial or quasi-judicial proceeding. Statements to community members, in the post-termination memorandum, and in Town communications were likewise outside any privileged proceeding and are independently actionable.

134.     Defendants' conduct was willful and malicious, not mistake or negligence, but deliberate escalation unsupported by consistent documentation or verified facts.

**COUNT VIII – Abuse of Process:**

**(Utah Common Law)**

135.     Utah recognizes a claim for abuse of process where a defendant uses legal process for an ulterior purpose, and commits a willful act in the use of that process that is not proper in the regular conduct of the proceeding. See *Hatch v. Davis*, 2006 UT 44, ¶ 10, 147 P.3d 383.

136.     Defendants used legal process for purposes other than legitimate adjudication, including to pressure Plaintiff, deter her from pursuing legal remedies, and gain leverage in the employment dispute. This included:

Rutherford v. Town of Leeds et al., Complaint

a. Terminating Plaintiff after she contacted the prosecutor directly and provided an honest account that did not support Mayor Hoster's charges against the former Councilmember;

b. Submitting a criminal referral the same morning Plaintiff prevailed on her unemployment claim;

c. Supplying the coerced Stone statement that induced a plea offer conditioned on the threat of additional charges, resulting in the filing of witness tampering the same day Plaintiff rejected the offer; and

d. Presenting Plaintiff's UGIA Notice of Claim to Mr. Jaeger, who then stated he was opening a criminal investigation into the Notice and later stated he had referred counsel's conduct to the Bar.

137. Plaintiff incorporates the allegations and arguments provided above in Count I, which argue the temporal proximity infers causation.

138. Plaintiff suffered lost wages, reputational harm, emotional distress, and economic losses as a direct result of Defendants' actions.

**COUNT IX – Intentional Infliction of Emotional Distress (IIED)**

**(Utah Common Law):**

139. Utah law recognizes a claim for intentional infliction of emotional distress where a defendant engages in extreme and outrageous conduct and intentionally or recklessly causes severe emotional distress. See *Prince v. Bear River Mut. Ins.*, 2002 UT 68, ¶ 34, 56 P.3d 524.

140. Defendants engaged in a sustained course of escalating conduct that included:

43

Rutherford v. Town of Leeds et al., Complaint

a. A pattern of hostility toward Plaintiff in her role as Town Clerk, including threats of termination for communicating with Councilmembers and fabricated disciplinary pretexts, following a pattern that had already driven her predecessor to resign, as described above;

b. Terminating Plaintiff without notice or opportunity to respond, then publicly characterizing her conduct as "admitting to a felony on record" before any charge had been filed, as described above;

c. Using law enforcement to intimidate community members who supported Plaintiff, as described above;

d. Referring and advocating for felony charges despite inconsistent documentation and no new evidence, including supplying coerced witness statements that armed the threat of additional charges in the plea offer, and submitting altered termination documentation to support the allegations, as described above;

e. Coercing Town personnel to generate and revise witness statements during prosecution, as described above;

f. Inducing threats of criminal investigation and Bar discipline against Plaintiff's counsel after she served a Notice of Claim, as described above

g. Participating in an accountant's audit process that attributed policy noncompliance to Plaintiff by name in all but designation, as the only former employee during the audit period, without notice to Plaintiff or any opportunity to respond, embedding reputational harm in an official public record that was subsequently published on March 6, 2026. (Ex. W).

Rutherford v. Town of Leeds et al., Complaint

141.        Together, this pattern of hostility, retaliatory termination, public accusation of felonies, escalation of charges, witness coercion, weaponization of legal process, and publication of stigmatizing audit findings, exceeds the bounds of decency. No single act defines this claim; it is their cumulative and escalating nature that renders the conduct extreme and outrageous.

142.        Defendants acted with intent to cause, or in reckless disregard of the likelihood of causing, severe emotional distress. The nature, timing, and escalation of the conduct support an inference that it was calculated to punish and intimidate Plaintiff.

143.        As a direct and proximate result, Plaintiff suffered damages as set forth herein, including lost wages, reputational harm, emotional distress, and economic losses.

## VI. JURY DEMAND

144.        Plaintiff demands a trial by jury on all claims.

## VII. PRAYER FOR RELIEF

145.        Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

    a.  Compensatory damages, including back pay, front pay, lost benefits, reputational harm, emotional distress, and all other economic and non-economic losses, in an amount to be proven at trial;

    b.  Punitive damages against Mayor Hoster in his individual capacity;

    c.  Attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

    d.  Pre- and post-judgment interest as permitted by law;

Rutherford v. Town of Leeds et al., Complaint

    e.   Declaratory relief that Defendants' conduct violated Plaintiff's constitutional and statutory rights;

    f.   Injunctive relief as appropriate; and

    g.   Such other relief as the Court deems just and proper.


DATED this 12th day of March, 2026.

BEAR Law Group

/s/ Amanda M. Hansen                      /s/ Nathaniel F. McKean
Amanda M. Hansen (17227)              Nathaniel F. McKean (17273)

*Attorneys for Plaintiff*
532 N Colorado St, Salt Lake City, UT 84116
(801) 448-6167
bearlawgroup@outlook.com

Rutherford v. Town of Leeds et al., Complaint

**LIST OF EXHIBITS:**

| | | |
|---|---|---|
| A | Town Council Meeting Minutes (Plaintiff's appointment) | Mar 27, 2024 |
| B | Resolution 2013-03 (Policies & Procedures) Section 8, Disciplinary Action (pp. 21-23) | Jan, 2013 |
| C1 | UI Appeals Hearing Audio File | July 23, 2025 |
| C2 | UI Appeals Hearing Transcript | July 23, 2025 |
| D | Mayor memo to Plaintiff: "Expectations…" | Feb 5, 2025 |
| E | Termination Notice 1 – Original, given to Plaintiff | May 12, 2025 |
| F | Termination Notice 2 – Submitted in UI Appeals Hearing | July 23, 2025 |
| G1 | Termination Meeting Audio Recording | May 12, 2025 |
| G2 | Termination Meeting Transcript | May 12, 2025 |
| H | Mayor memo/email to Council re. Termination | May 12, 2025 |
| I1 | Town Council Meeting – Audio (May 14, 2025) | May 14, 2025 |
| I2 | Town Council Meeting – Selected Transcript (May 14, 2025) | May 14, 2025 |
| I3 | Town Council Meeting – Signed Minutes (May 14, 2025) | May 14, 2025 |
| K | Dan Brown sworn statement | Oct 24, 2025 |
| L | Robyn Snyder photograph and letter | Oct 15-16, 2025 |
| M | Lynn Potter letter | Sep/Oct 2025 |
| N | Mayor criminal referral law enforcement re trailer | July 1, 2025 |
| O | Sheriff incident report | July 10, 2025 |
| P | Criminal Summons (State v. Rutherford) | July 22, 2025 |
| Q | Bill Stone handwritten letter | Sep 29, 2025 |
| R | Amended Filing (adds witness tampering) | Oct 2, 2025 |
| S | AMH / Ericson email exchange re. plea refusal | Oct 1-2, 2025 |
| T | Memo to Prosecutor with Exhibits – dismissal request | Oct 24, 2025 |
| U | Taylor Investigative report (County Attorney) | Nov 2025 |
| V | Order of Dismissal (without prejudice) | Dec 4, 2025 |
| W | HintonBurdick Independent Accountant's Report | Oct 22, 2025 |
| X | UGIA Notice of Claim, with attached Cease and Desist | Oct 16, 2025 |
| Y | Clarification to Bosserman re. Notice of Claim (part 1 of 2) | Nov 17, 2025 |
| Z | Jaeger email threat of criminal investigation of counsel | Nov 2, 2025 |
| AA | Jaeger/AMH email exchange, including Bar referral threat | Dec 1-3, 2025 |
| BB | WCRP Executive Team document | 2025 |
| CC | Washington County Facebook post – Jaeger sworn in | Aug 13, 2025 |
| DD | Resource Pro employment offer withdrawal | Oct 9, 2025 |
| EE | Utah State Auditor Financial Certification, Town of Leeds | Jun 30, 2025 |